United States District Court
Southern District of Texas
**ENTERED**
November 01, 2016
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CITGO PETROLEUM CORPORATION, | § | |
| | § | |
| Plaintiff/ | § | |
| Counter-Defendant, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-16-0952 |
| | § | |
| FIDELITY AND DEPOSIT COMPANY | § | |
| OF MARYLAND, | § | |
| | § | |
| Defendant/ | § | |
| Counter-Plaintiff. | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the court are Defendant Fidelity and Deposit Company of Maryland's Motion for Summary Judgment and Brief In Support Thereof ("F&D's MSJ") (Docket Entry No. 18) and Plaintiff's Motion for Summary Judgment ("CITGO's MSJ") (Docket Entry No. 20). For the reasons stated below, Defendant's motion will be granted and Plaintiff's motion will be denied.

### I.  Stipulated Facts and Procedural Background

Plaintiff CITGO Petroleum Corporation ("CITGO") filed suit against Fidelity & Deposit Company of Maryland ("F&D"), seeking to recover damages under Surety Bond No. 09159686 ("the Bond"), plus interest, costs, and attorneys' fees.  F&D removed the suit to this court.  In support of their motions for summary judgment, the parties have stipulated to the following facts:

1. Plaintiff [CITGO] filed suit against [F&D] on March 11, 2016 in Texas state court. CITGO asserts claims related to [the Bond] and its riders. CITGO seeks to recover $708,165.32 in damages under the bond, plus interest, costs, and attorneys' fees. Pl.'s 1st Am. Compl. ¶ 24.

2. F&D removed the suit to the U.S. District Court for the Southern District of Texas on April 7, 2016.

3. CITGO and Gas-Mart USA, Inc. ("Gas-Mart") executed a certain Marketer Franchise Agreement ("MFA") on September 10, 2013, a true and accurate copy of which is attached as Exhibit A and incorporated herein by reference.

4. CITGO and Gas-Mart executed an amendment to the MFA on October 20, 2014, a true and accurate copy of this amendment is attached as Exhibit B and incorporated herein by reference.

5. CITGO and Gas-Mart entered into a Competitive Allowance Agreement ("CAA") on October 23, 2013, a true and accurate copy of which is attached as Exhibit C and incorporated herein by reference.

6. Gas-Mart missed a payment due to CITGO in August 2014.

7. On September 3, 2014, F&D issued [the Bond]. The original Surety Bond had a Penal Sum of one million dollars, a true and accurate copy of which is attached as Exhibit D and incorporated herein by reference.

8. The parties increased [the Bond's] Penal Sum to $1.5 million on September 9, 2014. A true and accurate copy of the increase rider is attached as Exhibit E and incorporated herein by reference.

9. The parties executed another rider to the bond on August 12, 2015. A true and accurate copy of this rider is attached hereto as Exhibit F and incorporated herein by reference.

10. On July 1, 2015, CITGO discovered that an EFT request for over $218,000 to Gas-Mart was returned unpaid. Pl.'s 1st Am. Compl. ¶ 16.

11. On July 2, 2015, Gas-Mart filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. At this time, Gas-Mart owed $977,581.30 to CITGO. *Id.*

12. CITGO filed a Proof of Claim in Gas-Mart's bankruptcy proceeding on December 28, 2015. A true and accurate copy of that Proof of Claim is attached as Exhibit G and incorporated herein by reference.

13. The parties entered into a Critical Vendor Agreement ("CVA") on August 6, 2015, regarding Gas-Mart's bankruptcy proceedings, a true and accurate copy of which is attached as Exhibit H and incorporated herein by reference.

14. Pursuant to the CVA, F&D remitted payment to CITGO on August 12, 2015 for $756,391.18. See CVA § 3.

15. On February 10, 2016, Carol Smith, counsel for F&D in another proceeding, e-mailed Mark Benedict, counsel for CITGO in another proceeding, regarding Gas-Mart's current accounts receivable balance. A copy of this email correspondence is attached as Exhibit I.

16. Gas-Mart missed another payment due to CITGO on February 12, 2016. Gas-Mart's CITGO-branded gas stations have now de-branded, and CITGO has issued invoices to Gas-Mart for the unamortized costs of branding materials used at those gas stations and for the reimbursement of allowances that CITGO paid Gas-Mart under the CAA in connection with those now de-branded stations. True and accurate copies of these invoices are included in Exhibit J. Gas-Mart failed to remit payment for these invoices.

17. Gas-Mart no longer supplies any CITGO branded stations with CITGO branded motor fuels. Pl.'s 1st Am. Compl. ¶ 20.

18. On March 10, 2016, CITGO notified F&D of Gas-Mart's breach of contract and demanded full payment under [the Bond] in the amount of $743,532.63 from F&D. A true and accurate copy of this letter and its enclosures is attached as Exhibit J.

19. F&D responded to CITGO's March 10, 2016 demand on April 6, 2016 by agreeing to pay CITGO $35,367.31. A true and accurate copy of the letter in which F&D agreed to pay this amount is attached as Exhibit K.

20. F&D remitted payment in the amount of $35,367.31 to CITGO, further reducing the Penal Sum of [the Bond] to $708,165.32.

(Stipulation of Material Facts ("Stipulation"), Exhibit 1 to CITGO's MSJ, Docket Entry No. 20-1, pp. 1-3)

The Bond contained, <u>inter alia</u>, the following provisions:

WHEREAS, the Principal and the Obligee have entered into that certain Marketer Franchise Agreement (Agreement Number: _____) dated <u>September 10, 2013</u>, hereinafter called the 'Agreement' as the same may be subsequently modified, amended, or extended, for the purchase of a minimum amount of the monthly quantity of CITGO-branded gasoline, hereinafter called the "Gasoline" as defined in said Agreement;

WHEREAS, the Obligee has requested the Principal to furnish security, which may be satisfied by the use of a surety bond in the form and tenor of this instrument; and

WHEREAS, that in the event the Principal defaults under the Agreement terms by failing to remit payment for Gasoline, the Surety shall pay the Obligee within thirty (30) days after Obligee's request in an amount equivalent to any unpaid portions due to Obligee pursuant to said Agreement but not to exceed the Penal Sum of this Bond.[1]

The parties dispute the scope of F&D's obligations under the Bond. CITGO claims that it is entitled to collect all amounts, up to the Penal Sum of the Bond, due and owed to it by Gas-Mart under the MFA and CAA, including allowances and de-branding costs. F&D responds that the Bond only requires it to reimburse CITGO for

---

[1]Surety Bond, Exhibit D to Stipulation, Docket Entry No. 20-1, p. 36.

unpaid gasoline. The parties agree that the Bond sets forth their respective obligations but disagree as to its meaning. The parties have each filed motions for summary judgment in which they ask the court to construe the contract as a matter of law.

## II. Standard of Review

Summary judgment is appropriate if the movant establishes that there is no genuine dispute about any material fact and the law entitles it to judgment. Fed. R. Civ. P. 56(c). Disputes about material facts are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 106 S. Ct. 2505, 2510 (1986). The moving party is entitled to judgment as a matter of law if "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Celotex Corp. v. Catrett, 106 S. Ct. 2548, 2552 (1986).

A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam) (quoting Celotex, 106 S. Ct. at 2553). "If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response." Id. If, however, the moving party meets this burden, "the nonmovant must go beyond the pleadings" and

produce evidence that specific facts exist over which there is a genuine issue for trial. Id. (citing Celotex, 106 S. Ct. at 2553-54).

In reviewing the evidence "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Products, Inc., 120 S. Ct. 2097, 2110 (2000). The court resolves factual controversies in favor of the nonmovant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." Little, 37 F.3d at 1075. In a contract interpretation dispute, summary judgment is appropriate where the language of the contract is unambiguous. See Hanssen v. Qantas Airways Ltd., 904 F.2d 267, 269 n.3 (5th Cir. 1990) (citation omitted). "When parties file cross-motions for summary judgment, [courts] review 'each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party.'" Cooley v. Housing Authority of City of Slidell, 747 F.3d 295, 298 (5th Cir. 2014) (quoting Ford Motor Co. v. Texas Department of Transportation, 264 F.3d 493, 498 (5th Cir. 2001)).

### III. Analysis

#### A. Applicable Law

The court interprets the Bond as it would any other written agreement, according to the general principles of contract

interpretation articulated by the Texas Supreme Court. <u>See generally</u> <u>Coker v. Coker</u>, 650 S.W.2d 391 (Tex. 1983).[2] First, the court determines whether the contract is enforceable as written, without resort to parol evidence. <u>J.M. Davidson, Inc. v. Webster</u>, 128 S.W.3d 223, 229 (Tex. 2003). The court's primary objective is to ascertain the intentions of the parties as expressed in the contract. <u>Lopez v. Muñoz, Hockema & Reed, L.L.P.</u>, 22 S.W.3d 857, 861 (Tex. 2000) (citation omitted).

The court should examine the entire contract in order to "harmonize and give effect to all of the provisions of the contract so that none will be rendered meaningless." <u>Webster</u>, 128 S.W.3d at 229 (citation omitted). Where several instruments are executed as part of the same transaction, they will be read together and each will be construed with reference to the other. <u>Shield v. Shield</u>, 286 S.W.2d 252, 258 (Tex. Civ. App.--El Paso 1955, <u>writ ref'd n.r.e.</u>).

A contract is unambiguous if it can be given a definite or certain legal meaning. <u>Id.</u> (citation omitted). Ambiguity does not arise because of a "simple lack of clarity," or because the parties proffer different interpretations of the contract. <u>DeWitt County Elec. Co-op., Inc. v. Parks</u>, 1 S.W.3d 96, 100 (Tex. 1999) (citations omitted). Rather, a contract is ambiguous only if it is

---

[2]The Fifth Circuit provided the helpful summary of Texas law that follows in <u>McLane Foodservice, Inc. v. Table Rock Restaurants, L.L.C.</u>, 736 F.3d 375, 377-78 (5th Cir. 2013).

subject to two or more reasonable interpretations after applying the pertinent canons of construction. Webster, 128 S.W.3d at 229 (citation omitted). If the contract is ambiguous, courts may consider parol evidence for the purpose of ascertaining the parties' intent. David J. Sacks, P.C. v. Haden, 266 S.W.3d 447, 450-51 (Tex. 2008).

## B. F&D's Motion for Summary Judgment

F&D argues that the Bond only obligates it to reimburse CITGO for unpaid gasoline. F&D offers five arguments in support of its motion: (1) the principle of strictissimi juris requires that the court strictly interpret any uncertainty in the Bond in favor of the surety; (2) the Bond provisions, when read in their entirety, only require F&D to reimburse CITGO for unpaid gasoline; (3) the de-branding costs sought by CITGO are owed under the CAA, which is not mentioned in the Bond; (4) the requirements of the Bond do not apply to the CAA; and (5) the parties' course of dealing demonstrates that the Bond was limited to gas purchases.

CITGO responds that the plain language of the Bond "unambiguously requires F&D to pay CITGO for Gas-Mart's total indebtedness to CITGO pursuant to the Underlying Agreements."[3] CITGO also argues that the Bond must be construed in the context of the underlying "Agreements," and that F&D's "constrained" reading of the Bond ignores its plain language and underlying intent.

---

[3] CITGO's MSJ, Docket Entry No. 20, p. 15.

Because the court concludes that the terms of the Bond are subject to only one reasonable interpretation, the court need not look beyond the agreements. The principle of <u>strictissimi juris</u> applies only to the extension of a surety by construction or implication; it is not a canon of construction. <u>Wasserberg v. Flooring Services of Texas, LLC</u>, 376 S.W.3d 202, 206 (Tex. App.--Houston [14th Dist.] 2012, no pet.). Similarly, because the Bond is unambiguous, the court will not consider the parties' course of dealing. See <u>Anglo-Dutch Petroleum International, Inc. v. Greenberg Peden, P.C.</u>, 352 S.W.3d 445, 451 (Tex. 2011) ("Only where a contract is ambiguous may a court consider the parties' interpretation and 'admit extraneous evidence to determine the true meaning of the instrument.'") (citations omitted). The court therefore does not rely on the Affidavit of Thomas Dabovich.[4] Neither the parties' knowledge of other agreements nor subjective intent is relevant where the terms of the contract are unambiguous. F&D's remaining arguments are addressed below.

1. <u>The Bond and the MFA</u>

The parties dispute the scope of the obligations arising from the phrase "any unpaid portions due to Obligee pursuant to said Agreement."[5] In order to determine whether the disputed phrase can

---

[4]Exhibit 1 to Defendant Fidelity and Deposit Company of Maryland's Response to Plaintiff's Motion for Summary Judgment and Brief in Support Thereof, Docket Entry No. 22-1.

[5]Bond, Exhibit D to Stipulation, Docket Entry No. 20-1, p. 36.

be given a definite or certain legal meaning, the court looks first to the Bond and then to the MFA as incorporated by reference and applies the appropriate canons of construction.

The court reads the words of a contract in context because a word or phrase is often known by the company it keeps, a principle expressed in the maxim noscitur a sociis. Tekelec, Inc. v. Verint Systems, Inc., 708 F.3d 658, 665 (5th Cir. 2013) (citing United States Fidelity and Guaranty Co. v. Goudeau, 272 S.W.3d 603, 606 (Tex. 2008). A correlative of this principle is the rule of ejusdem generis. "[W]hen words of a general nature are used in connection with the designation of particular objects or classes of persons or things, the meaning of the general words will be restricted to the particular designation." Hilco Electric Cooperative v. Midlothian Butane Gas Co., Inc., 111 S.W.3d 75, 81 (Tex. 2003) (citation omitted); see also Cleveland v. United States, 67 S. Ct. 13, 15 (1946) ("Under the ejusdem generis rule of construction, the general words are confined to the class and may not be used to enlarge it."). "For example, in the phrase horses, cattle, sheep, pigs, goats, or any other farm animals, the general language or any other farm animals – despite its seeming breadth – would probably be held to include only four-legged, hoofed mammals typically found on farms, and thus would exclude chickens." EJUSDEM GENERIS, Black's Law Dictionary (10th ed. 2014) (emphasis in original).

The court concludes that the only reasonable interpretation of the phrase "any unpaid portions due to [CITGO] pursuant to said Agreement" obligates F&D to pay unpaid gasoline invoices pursuant to the MFA. The language of the Bond makes this clear.

First, the Bond identifies the Agreement giving rise to Gas-Mart's obligation as the MFA. The Bond refers to the MFA as an agreement for "the purchase of a minimum amount of the monthly quantity of CITGO-branded gasoline." The Bond makes no mention of branding costs or allowances.

The Bond then provides that the Surety's obligation is triggered "in the event [Gas-Mart] defaults under the Agreement terms," but only if it defaults "<u>by failing to remit payment for Gasoline</u>" (emphasis added). Since F&D was only obligated in the event that Gas-Mart failed to pay for gasoline, only the unpaid portions of the gasoline bill were guaranteed.

Finally, the Bond identifies the amount the Surety shall pay in the event of the specified default: "an amount equivalent to any unpaid portions due to Obligee pursuant to said Agreement but not to exceed the Penal Sum of the Bond." The general word "any" cannot, as CITGO argues, enlarge F&D's obligation beyond the more specific language preceding it. In context, the only reasonable construction of the phrase "any unpaid portions" is in the context of gasoline purchases.

The court's construction is further supported by the MFA's provision regarding security agreements. CITGO alleges that

-11-

Gas-Mart was required to obtain the Bond at CITGO's request by § 5(b) of the MFA.[6] That section requires Gas-Mart to provide collateral "in order to maintain a credit limit" and is located in the part of the MFA dealing with terms of payment for fuel purchases made on credit.[7]

These provisions restrict what could otherwise be a generalized reference to any of Gas-Mart's unpaid obligations. No reasonable interpretation of the phrase "unpaid portions" in this context could include de-branding costs or costs arising under other agreements.

   2.   The CAA

CITGO and Gas-Mart entered into the CAA because CITGO sought to meet a competitor's offer. In order to retain Gas-Mart's business CITGO offered incentives in the form of an up-front allowance of $0.0170 per gallon at certain locations and an allowance for branding costs.[8] These allowances were conditioned in part on future increases in monthly volume and on Gas-Mart maintaining CITGO-branded locations for a predefined period. CITGO argues that because the CAA altered the monthly volume stated in the MFA, the CAA, the MFA, and the Bond must be construed together.

---

[6] Plaintiff's First Amended Complaint, Docket Entry No. 10, p. 3.

[7] MFA, Exhibit A to Stipulation, Docket Entry No. 20-1, pp. 11-12.

[8] CAA, Exhibit C to Stipulation, Docket Entry No. 20-1, pp. 32-34.

CITGO argues that it "obtained a bond that would make CITGO whole for 'all unpaid portions' due pursuant to the Underlying Agreements [plural] in the event that Gas-Mart breached its obligation to pay for Motor Fuels."[9] Despite the use of the singular "Agreement" in the Bond, CITGO insists that the "plain terms" obligate F&D under both the MFA and CAA (what CITGO refers to as the "Underlying Agreements"). CITGO also argues that "unpaid portions" refers to all obligations owed by Gas-Mart under both agreements, not just unpaid fuel invoices.

The court is not persuaded by CITGO's argument that the CAA amends the MFA and that the two agreements must be read together with the Bond to interpret the parties' intent. Neither the Bond nor the MFA makes any mention of the CAA. The CAA is a separate agreement and does not state that it modifies, amends, or extends the MFA.

The Bond refers to a single "Agreement": the MFA. The MFA contains a provision, § 2(c), dealing with amendments to monthly fuel quantities.[10] The provision states that adjustments to the monthly quantities "shall be confirmed by an Amendment to this Agreement."[11] Exhibit B to the Parties' Stipulation of Material Facts is an example of such an amendment. The exhibit, titled

---

[9]CITGO Petroleum Corporation's Response to F&D's Motion for Summary Judgment, Docket Entry No. 23, pp. 10-11.

[10]MFA, Exhibit A to Stipulation, Docket Entry No. 20-1, p. 9.

[11]Id.

"Amendment to Marketer Franchise Agreement" ("the Amendment") adjusts the monthly fuel quantities and explicitly amends the MFA. It states that CITGO and Gas-Mart "agree to amend" the MFA's monthly gasoline quantities while "all other terms and conditions of the agreement" remain "in full force and effect."[12]

Unlike the Amendment, the CAA does not purport to amend any other agreement. The closest the CAA comes to amending the MFA is in § 4, which states in relevant part:

> The Maximum annual gallonage eligible for the Per Gallon Allowance will be limited to a 20% growth factor per year of the then contract volume attributed to the Location. The Marketer will increase the Marketer Franchise Agreement (MFA) monthly volume by the amount specified for the Location in this Agreement. The MFA volume will also be adjusted upward at the end of the first six months to reflect any increased volume above the original volume attributed to the Location. . . . Failure to make these adjustments will cause the Allowance to terminate.

This language pertains to the allowance granted in the CAA. It conditions the allowance on adjustments to be made to the monthly volumes provided in the MFA, but does not state that the CAA alters those volumes or amends the MFA in any other way. The future tense used in the CAA stands in contrast to the present tense of the Amendment and undermines CITGO's argument that the two share a similar purpose. Moreover, the Amendment, signed nearly a year after the CAA, tellingly makes no reference to the CAA.

The CAA is a distinct agreement that merely conditions the allowances on adjustments to the MFA's monthly volume. It does not

---

[12]The Amendment, Exhibit B to Stipulation, Docket Entry No. 20-1, p. 30.

alter the terms of payment or in any other way affect F&D's obligation under the Bond. Nor can the CAA's allowances be construed as "unpaid portions" of gasoline payments that F&D would owe under the Bond. The allowances in the CAA are provided by CITGO under the CAA in an effort to "meet [a] competitor's offer." They are a discount for which Gas-Mart agreed to reimburse CITGO in the event that the covered locations de-branded during the term of the CAA. The allowances are not an "unpaid portion" of a payment for Gasoline.

Even assuming for the purposes of argument that the CAA amended the MFA, the court, upon construing the instruments together, concludes that the CAA does not alter the terms of payment or otherwise affect F&D's obligation under the Bond. The CAA might, as a subsequent agreement between CITGO and Gas-Mart, supersede the MFA where the two conflict. But the CAA cannot expand F&D's obligation beyond unpaid portions of fuel invoices. Because the CAA does not modify, amend, or extend any of the terms of the MFA pursuant to which F&D would be obligated, it does not affect the court's construction of the Bond.[13]

## C. CITGO's Motion for Summary Judgment

The court has considered CITGO's motion separately and does not detect in it any argument or authority that would persuade the court to construe the Bond differently. Because a plain reading of

---

[13] See supra Part III.B.1.

the Bond does not obligate F&D to pay for de-branding costs or allowances, CITGO's motion will be denied.

## IV. Conclusions and Order

For the reasons stated in § III.B., above, Defendant Fidelity and Deposit Company of Maryland's Motion for Summary Judgment (Docket Entry No. 18) is **GRANTED**. Plaintiff's Motion for Summary Judgment (Docket Entry No. 20) is **DENIED**. Because this Memorandum Opinion and Order appears to resolve the entirety of CITGO's claim, the only issue remaining before the court is F&D's counterclaim. The parties are directed to submit a proposed scheduling order for resolving the remaining issue within thirty days from the entry of this Memorandum Opinion and Order.

**SIGNED** at Houston, Texas, on this 1st day of November, 2016.

_____
SIM LAKE
UNITED STATES DISTRICT JUDGE